Randy James BARBER, Administrator of
the Estate of Kenneth Robert Barber,
Deceased, Plaintiff–Appellant,

v.

CITY OF SALEM, OHIO, et al.,
Defendants–Appellees.

No. 91–3310.

United States Court of Appeals,
Sixth Circuit.

Submitted Nov. 22, 1991.

Decided Jan. 7, 1992.

Bernard Fineman, Aronson, Fineman & Davis Co., LPA (briefed), East Liverpool, Ohio, for plaintiff-appellant.

Nick Tomino, Reminger & Reminger (briefed), Cleveland, Ohio, Earl A. Schory, III, Office of Director of Law, Salem, Ohio, for defendants-appellees.

Before JONES and MILBURN, Circuit Judges, and ENGEL, Senior Circuit Judge.

MILBURN, Circuit Judge.

Randy James Barber, Administrator of the Estate of Kenneth Robert Barber, deceased, appeals the district court's grant of summary judgment in favor of defendants. The district court also dismissed plaintiff's pendent state claims pursuant to Federal Rule of Civil Procedure 12(b)(1).

Plaintiff in his capacity as administrator, brought this action under 42 U.S.C. § 1983 for various alleged constitutional violations and under Ohio state law for alleged wrongful death and a survivor claim for defendants' alleged failure to exercise reasonable care to ensure the decedent's safety while confined in defendants' jail. The decedent, Kenneth Robert Barber, committed suicide at the Salem, Ohio, City Jail on January 22, 1982, after being arrested and jailed for driving under the influence of alcohol and driving without a valid driver's license. The defendants in this case are the City of Salem ("City") and the following individuals in their official and individual capacities, viz., Mayor Robert Sell, Chief of Police John Sommers, Lt. Raymond Esterly, Police Officer Paul Bradley, Police Officer John Petrachkoff, and Auxiliary Officer Edward Hardy.

On appeal, plaintiff raises two issues which he states as follows: (1) Whether the district court erred in granting the defendants' motion for summary judgment on the basis that defendant Police Officers Esterly, Bradley, Hardy and Petrachkoff were entitled to qualified immunity as to plaintiff's claim under 42 U.S.C. § 1983, in holding that defendants City of Salem, Mayor Sell, and Police Chief Sommers did not have a constitutional duty to train the police officers in suicide prevention; and (2) whether the conduct of defendants City of Salem, Mayor Sell, and Police Chief Sommers constituted a deliberate indifference to the substantive constitutional rights of the decedent under 42 U.S.C. § 1983. For the reasons that follow, we affirm.

I.

On January 21, 1982, at approximately 11:30 p.m., Kenneth Robert Barber and his fiancee, Kathy Simpson, went to a tavern to celebrate a friend's birthday. At approximately 1:40 a.m., an automobile driven by Barber was stopped by Police Officers Bradley and Hardy. Barber was placed under arrest and charged with driving under the influence of alcohol and without a valid license. Officer Bradley drove Barber to the Salem city jail while Officer Hardy drove Barber's passenger, Kathy Simpson, to the Salem city jail.

In her deposition, Simpson testified that while Barber was being "booked," Barber asked one of the officers what was the offense with which he was being charged. The officer then "shoved" Barber against a wall and told Barber something to the effect that he knew what he was being "booked for." Simpson further testified that Barber asked an officer about the sentence that he might receive if convicted of the offenses for which he was charged. One of the officers offered to obtain Barber's record, bring it back to him, and discuss the possibilities with him. Another officer, however, shouted, "If I had my

way, you will get six months to a year." Both of these incidents occurred in the presence of Lt. Esterly, the shift commander; Officer Petrachkoff, the desk man and jailer for the night shift; and Officers Bradley and Hardy.

At 2:17 a.m., Barber took a breathalyzer test which registered a thirteen percent breath-alcohol reading. An officer informed Barber that if he could raise $300 for a bond, he could go home. Barber informed Simpson that the only way he could raise the money for the bond was to call his mother which he did not want to do. An officer then took his shoe strings, belt, wallet and handkerchief. Simpson further testified that Barber expressed concern that his job, his engagement to her, and his ability to obtain custody of his young son would be jeopardized by a long jail sentence. According to Simpson's testimony, Barber said to her: "Before it is all over with, I am going to lose my son and you too." At approximately 2:40 a.m., Barber was placed in a jail cell alone on an empty cell block where he could not be observed visually. An electronic audio monitor was present in Barber's cell, but plaintiff maintains that the monitor provided inadequate surveillance.

The shift commander, Lt. Esterly, left the Salem city jail at approximately 2:25 a.m. to patrol the city and did not return that night. At approximately 3:05 a.m., Officer Bradley went to the cell block to give Barber some matches. Officer Bradley testified in his deposition that when he left the cell block, Barber appeared to be going to sleep, and plaintiff does not dispute this contention. Thereafter, Bradley left the Salem city jail for the remainder of the night. Officer Hardy took Simpson home and did not return to the Salem city jail. Officer Petrachkoff remained stationed at the police department desk and did not at any time go into the cell block that night. There was no other inspection made of Barber's jail cell that night.

A new shift of police officers arrived at the Salem city jail the following morning at 8:25 a.m. When William Gray, the new shift's desk man, went to inspect the cell block, he found Barber hanging by the neck from a noose tied to horizontal bars at the top of the cell door. The noose had been made from a strip of the blanket which had been placed in the jail cell. Barber was left hanging for approximately forty-five minutes until the Columbiana County Coroner, Dr. William Kolozsi, arrived. Barber was then cut down, and the coroner examined the body for approximately ten to fifteen minutes. Coroner Kolozsi determined that the cause of death was asphyxiation and choking and noted that other significant conditions were depression and acute alcoholism. He further determined that the time of death was 6:15 a.m. and that there was a ten-minute interval between the initial hanging and Barber's subsequent death. The coroner's investigator wrote on his report the following: "Apparent motivation, decedent intoxicated, apparently overwrought over recent arrest."

Coroner Kolozsi did not perform an autopsy, but a blood alcohol test was taken which showed a result of .114 milligrams per deciliter. Plaintiff alleges that this blood test disputes the coroner's determination that Barber's death occurred at 6:15 a.m. Coroner Kolozsi did not determine the metabolism rate of alcohol. Plaintiff also contends that the coroner did not know how to convert the breath alcohol percentage to a blood alcohol percentage to help determine the time of death. Plaintiff does not, however, offer an alternative estimate of Barber's time of death. Neither the Salem Police Department nor the coroner kept the noose which Barber used to hang himself.

Barber's suicide was the third alcohol-related suicide in the Salem city jail during a period of time of twenty-two years. In 1960, an inmate committed suicide by hanging himself in the Salem city jail within four hours after being arrested for an intoxication-related offense. In 1970, another inmate committed suicide by hanging himself within eleven hours of his arrest for intoxication.

After the first suicide, Coroner Kolozsi, who investigated both of these suicides,

recommended to the Salem Police Department that it more closely observe the prisoners. After the second suicide in 1970, Coroner Kolozsi informed the police department on numerous occasions that they should check on the prisoners more often. He informed Mayor Sell, the City Safety Director, and possibly Chief Sommers on several occasions about the need for closer and more frequent observation of the prisoners and made other suggestions which he believed would help prevent another suicide. In addition to more frequent observation, he recommended not placing a prisoner in a cell alone, removing blankets and other materials which prisoners could use to make a noose, and covering the horizontal bars over the cell door from which prisoners could hang themselves.

In his affidavit attached to defendants' motion for summary judgment, Police Chief Sommers stated that police officers in the Salem Police Department receive a minimum of 310 hours of training prescribed by the Ohio Peace Officer Training Council. However, Police Chief Sommers admits no formal training is given regarding suicide prevention. Nevertheless, Salem Police Officers are instructed to remove prisoners' belts and shoe laces and to be alert for abnormal behavior which may indicate a prisoner may harm himself. If a prisoner is exhibiting abnormal behavior, then the officers are to observe him more closely. Furthermore, according to the Salem Police Department regulations promulgated November 30, 1981, only one mid-shift inspection of a prisoner's jail cell is required during the last, early morning shift.

Plaintiff alleges that these measures do not comply with Ohio Revised Code § 5120.10 which sets forth minimum standards for full service jails. Requirements include preliminary health evaluations to determine if the prisoners are experiencing any serious mental disorders, in-person surveillance of prisoners at least every sixty minutes, and a number of requirements concerning proper corrections personnel training.

## II.

### A.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56. A district court's grant of summary judgment is reviewed de novo. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). On appeal, this court must view all facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Id.* Therefore, where facts are disputed in this case, plaintiff's version will be viewed as true. However, for the most part, the facts of this case are not disputed. Rather, the parties dispute the interpretation of these facts in light of the applicable constitutional standard.

### B.

In *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), the Supreme Court held that pretrial detainees who have not been convicted of any crimes retain, at the very least, the same constitutional rights enjoyed by convicted prisoners. In *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), the Supreme Court held that deliberate indifference to a prisoner's serious medical needs constitutes "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. *See also Wilson v. Seiter*, ——— U.S. ———, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991).

While a pretrial detainee does not enjoy protection of the Eighth Amendment, the Eighth Amendment rights of prisoners are analogous to pretrial detainees' due process rights under the Fourteenth Amendment. *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir.1990); *Belcher v. Oliver*, 898 F.2d 32, 35 (4th Cir.1990); *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir.1985). Furthermore, a municipality may also be liable under 42 U.S.C. § 1983 in certain circumstances for

constitutional violations arising from its failure to properly train its employees. *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). In order for a plaintiff to prevail against a municipality, the plaintiff must show that inadequate training represented a city policy and that the need for better training was so obvious and the inadequacy so likely to result in a violation of constitutional rights, that the municipality can be said to have been deliberately indifferent to the need. *Id.* 109 S.Ct. at 1204–05.

While plaintiff does not state precisely each of his federal claims against defendants, it nevertheless appears that plaintiff is arguing that defendants violated the decedent's due process rights by exhibiting deliberate indifference to his medical needs in a number of ways: (1) the failure of Officers Esterly, Bradley, Hardy, and Petrachkoff to properly screen Kenneth Robert Barber for suicidal tendencies and to take proper precautions to deter his suicide, and (2) the failure of the City of Salem, Mayor Sell, and Police Chief Sommers to train police officers to detect suicidal tendencies and to take precaution to deter suicide including the failure to modify the jail in such a way as to discourage suicides.

▇▇▇ The individual defendants argue that they are entitled to qualified immunity for liability under 42 U.S.C. § 1983 as to all claims made by plaintiff against them. A government official performing a discretionary function is entitled to qualified immunity in his personal capacity where the official's action (or failure to act) does not violate constitutional standards in light of clearly established law at the time the official acted. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). However, the right in question must be more than simply a generalized right. As this court explained in *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990):

> It must be clearly established in a "particularized" sense, so that "the contours of the right" are clear enough for any

reasonable official in the defendants' position to know that what the official is doing violates that right. [*Anderson*, 107 S.Ct. at] 3039. This particularity requirement does not mean that the very action in question has been held unlawful; it does mean, though, that in light of the preexisting law, the illegality of the action must be apparent. *Ibid.*

The district court relied on *Danese v. Asman* in determining that the individual defendants are entitled to qualified immunity in their personal capacities. The district court provides a brief and accurate synopsis of *Danese* in its opinion:

> In *Danese v. Asman, supra,* the plaintiffs sought to hold defendants liable for the suicide death of David Danese in the Roseville jail. Danese had been arrested for driving while intoxicated. He threatened suicide and said he "wished he were dead." The jail officials removed his belt and shoelaces and placed him in a cell. He also told a guard that if he was not [sic] given a cigarette he would hang himself with his shirt. A television monitor used to watch prisoners was not operating. The Court of Appeals found that the jail officials were not required to scrutinize prisoners to detect suicidal tendencies even under the facts of that case. The decedent did not have to be placed in suicide-proof facilities. Because there was no clearly established right to a suicide prevention facility for pretrial detainees, the police officers were entitled to qualified immunity.

In reaching our decision regarding the police officers' qualified immunity in *Danese,* we considered the law clearly established at the time of the decedent's suicide. The decedent in *Danese* committed suicide in Roseville, Michigan, on November 9, 1982, or over nine months after Barber's suicide in this case. We stated that, "[w]ithout precedent establishing an unambiguous right to have the police diagnose one's condition as prone to suicide, these officers cannot be held liable for not taking extraordinary measures to restrain Danese." *Id.* at 1244.

In *Danese*, we also considered the liability of city officials for (1) failure to institute procedures to screen for suicidal tendencies, (2) failure to institute procedures to deter suicide, and (3) failure to modify the jail's structure to create a safe confinement area. Specifically, the plaintiff in *Danese* argued that the decedent should have been placed in a detoxification cell which contained a working television monitor for close surveillance and which contained no horizontal bars. In this case, plaintiff argues that a steel plate should have been placed over the cell's horizontal bars to prevent access to them, and a surveillance camera or other type of direct surveillance should have been installed in Barber's cell.

Regarding the issue of the city officials' qualified immunity, we stated in *Danese* that

[i]f the officers were not subject to a clearly established constitutional duty, their supervisors cannot be liable for not training them to meet such a duty.

.     .     .     .     .

We must point out, much as we did with the officers, that neither the plaintiffs nor the district court cite any cases holding that there exists a clearly established right to these suicide prevention facilities. Without a showing that the particular rights claimed to be violated were clearly established in law at the time of the alleged injury, we will not find public officials acting within their discretion personally liable for the violation of these rights.

*Id.* at 1245.

Thus, *Danese v. Asman* unequivocally holds that as of November 9, 1982, there existed no clearly established right to suicide prevention screening or facilities. Therefore, the police officers, Mayor Sell, and Police Chief Sommers are entitled to qualified immunity in their personal capacities from liability under section 1983 for the suicide death of Barber on January 22, 1982. Thus, the district court correctly analyzed and decided the issue of qualified immunity.

Notwithstanding our holding in *Danese v. Asman*, plaintiff argues that the district court failed to consider the affidavits of his two experts attached to his "Response Contra the Defendants' Motion for Summary Judgment." These affidavits concluded that the police officers had received inadequate training regarding suicide risks, the jail facility was inadequately designed to deter suicide, defendants failed to follow nationally recognized standards regarding jail suicide prevention, and that Barber's death could have been prevented were it not for the defendants' deliberate indifference to Barber's medical needs. While these conclusions may be evidence of defendants' negligence, they do not establish the proper constitutional standard in regard to qualified immunity under section 1983 for a jail suicide in January of 1982.

C.

The remaining issue concerns the City's liability under section 1983 for failure to provide the suicide deterrence measures that plaintiff claims should have been provided. In addition, the issue of the individual defendants' liability in their official capacities will be decided by the determination of the issue regarding the City's liability. This is true because a section 1983 action against a city official in his or her official capacity is treated as an action against the City entity itself. *See Hafer v. Melo,* —— U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1245 (6th Cir. 1989).

As plaintiff correctly argues, a municipality is not entitled to qualified immunity. *Owen v. City of Independence,* 445 U.S. 622, 657, 100 S.Ct. 1398, 1418, 63 L.Ed.2d 673 (1980); *Marsh v. Arn,* 937 F.2d 1056, 1071 (6th Cir.1991). While officials may not be liable under section 1983 because their actions (or failure to act) were not constitutional violations according to clearly established law at the time the actions took place, a municipality may nevertheless be liable if the actions complained of rise to the level of constitutional violations in light of present law. *Owen,* 445 U.S. at 657–58, 100 S.Ct. at 1418–19;

*Marsh,* 937 F.2d at 1056. Stated another way, it is possible that city officials may be entitled to qualified immunity for certain actions while the municipality may nevertheless be held liable for the same actions.[1] For example, in *Owen v. City of Independence,* the Supreme Court held that while city officials were entitled to qualified immunity in a section 1983 action for discharge of a police chief without a hearing after publicly denouncing him as a thief, the city was nonetheless liable. The Court so held even though the Court's prior case which set forth the right to a hearing in similar situations, was decided two months after the police chief was denounced and dismissed. *See also Marsh,* 937 F.2d at 1071 (while qualified immunity protects officials, "the doctrine of qualified immunity is no defense to municipal corporations which may otherwise be liable for federal constitutional violations under the Civil Rights Act.").

However, the district court in holding that the City was not liable for the suicide death of Kenneth Robert Barber stated:

> If no constitutional duty exists on the part of the police officers their supervisors cannot be liable for not training them to meet such a duty. [*Danese v. Asman,*] 875 F.2d at 1245. The same reasoning applies to the City. The City cannot be liable for breach of a constitutional duty that did not exist. The Salem Police Officers have qualified immunity because a duty to screen for suicidal tendencies did not exist at the time of this incident. Therefore, the City of Salem, Mayor Sell and Police Chief Sommers did not have a duty to train the police officers in suicide prevention.

Thus, the district court erroneously concluded that because the police officers were not liable, the City, Mayor Sell, and Police Chief Sommers in their official capacities could not be held liable. In *Danese* we did not consider municipal liability which is evaluated in light of present law. Therefore, as previously stated, consideration of the issue of the City's liability in this case requires examination of the law since November 9, 1982.

In *Roberts v. City of Troy,* 773 F.2d 720, 724–25 (6th Cir.1985), we held that to determine a defendant's liability under section 1983 for the suicide death of a detainee, the proper inquiry is whether the defendants were deliberately indifferent to the detainee's medical needs. We also considered the issue of a detainee's suicide in *Molton v. City of Cleveland,* 839 F.2d 240, 243 (6th Cir.1988), *cert. denied,* 489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989).

In *Molton,* the plaintiff, Administrator of the Estate of William Molton, deceased, sued the City of Cleveland under section 1983 for the jail suicide of William Molton. No individuals were named as defendants. William Molton was arrested by police while driving intoxicated. After a severe beating by police officers, he hung himself in the jail cell from a noose made from his shirt. Other detainees in the cell block called for help, but police officers ignored the cries for several minutes arriving only after the decedent successfully completed his task. The plaintiff argued that the City of Cleveland was deliberately indifferent to a strong likelihood that Molton would commit suicide by:

> (1) [O]peration of a jail with a remote cell block; (2) failure to develop and use health screening forms; (3) permitting ... a rookie officer, to supervise the jail facility; (4) inadequately training its officers in the prevention of jail suicides; (5) failure to install an audio communication system between the cell block and the office area; (6) failure to modify cell

---

1. Defendants cite *City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), to support their argument that if the police officers are not liable under section 1983 for a constitutional violation, then the City in turn cannot be liable. *Heller* does not support defendants' argument, however, because, as the Supreme Court noted, the police officers in *Heller* did not escape liability through qualified immunity. The jury simply found that the officers did not violate the constitutional rights of the plaintiff according to *any* constitutional standard and was not limited to examining the police officers' conduct in light of clearly established law existing at the time the conduct complained of took place. *Id.* at 798, 106 S.Ct. at 1572–73.

architecture to render suicide less likely; and (7) failure to take corrective measures after eight prior suicides had occurred in the jail facility.

*Id.* at 246.

We reversed the jury verdict against the City of Cleveland on the ground that the plaintiff had failed to produce any evidence of the city's custom or policy concerning the alleged constitutional violations. We also held, however, that the city's actions were mere negligence as opposed to deliberate indifference. We stated:

> The city did adopt *a* policy. Attempting to deal with the problem of jail suicides, of which there had been eight at this precinct since 1970, the City adopted GPO 34–80 which directs officers to remove the belts from all prisoners or detainees before they are placed in cells, and to provide extra surveillance whenever a person is: (a) extremely despondent; (b) threatens self-destruction; or (c) gives any other reason to believe that he may attempt suicide. Plaintiff submitted evidence that GPO 34–80 was inadequate, and argues here that better training of the City's officers and better jail facilities would have prevented [decedent's] death.

> .... The evidence in this case did not amount to proof of gross negligence or recklessness amounting to deliberate indifference. There has been no showing that City policy makers, as distinguished from the individual police officers who participated in Molton's arrest and booking either ignored a known or apparent risk, or consciously disregarded or were deliberately indifferent to the safety of prisoners. On the contrary, the proofs regarding GPO 34–80 show that the City undertook an initiative to prevent future jail suicides, but may have done so negligently. Negligence does not establish a § 1983 claim.

*Id.* at 246–247 (emphasis in the original).

Similarly, in *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir.1990), the

Eleventh Circuit rejected the plaintiff's section 1983 claim that jail personnel had a duty to screen detainees for suicidal tendencies. The Eleventh Circuit also held that the plaintiff's section 1983 claim for failure to properly monitor decedent's jail cell failed absent some knowledge of a strong likelihood, rather than a mere possibility, that self-infliction would occur. *Id.* at 1563–64. Implicit in *Popham* is a holding that simple knowledge that the detainee fits the profile of a high suicide risk is not enough. It must be knowledge specific to that particular detainee. *See Id.* at 1564; *see also Edwards v. Gilbert*, 867 F.2d 1271, 1275–76 (11th Cir.1989).

In *Popham*, the decedent was "emotional, depressed, and angry at the time of his arrest." *Popham*, 908 F.2d at 1563. Decedent was left alone in a cell with a surveillance camera which could not monitor the entire cell. No one checked on him for six hours during which time he hung himself. The decedent's emotional and depressed state was not enough to indicate a strong likelihood that self-inflicted harm would occur. *Id.* at 1564. *See also Edwards*, 867 F.2d 1271 (absent knowledge of strong likelihood that detainee would try to commit suicide, failure to take special precautions was not deliberately indifferent).

■ Other circuits also require some specific knowledge of suicidal danger before liability under section 1983 can attach. *See, e.g., Belcher v. Oliver*, 898 F.2d 32 (4th Cir.1990); *Estate of Cartwright v. City of Concord*, 856 F.2d 1437 (9th Cir. 1988); *State Bank of St. Charles v. Camic*, 712 F.2d 1140 (7th Cir.), *cert. denied*, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983).[2] Accordingly, we adopt the Eleventh Circuit's holding in *Popham* that the proper inquiry concerning the liability of a City and its employees in both their official and individual capacities under section 1983 for a jail detainee's suicide is: whether the

---

**2.** Both plaintiff and defendants comment upon *Rellergert v. Cape Girardeau County*, 924 F.2d 794 (8th Cir.1991). However, *Rellergert* is distinguishable from the present case because *Rellergert* was concerned with the proper suicide

deterrence measures required *after* suicidal tendencies are known and does not comment upon what actions are or are not required to screen for suicidal tendencies.

decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs. *See, e.g., Elliott v. Cheshire County, N.H.,* 940 F.2d 7 (1st Cir.1991) (Summary judgment in favor of corrections personnel in section 1983 action was improper where genuine issue of material fact existed as to whether corrections personnel knew of detainee's statement that he would kill himself).

■ In this case, the decedent did express concern over his job, his engagement, and his ability to obtain custody of his young son due to his arrest. However, such a reaction to an arrest for driving under the influence of alcohol could not be considered abnormal and would not alert the jail authorities to a strong likelihood that Kenneth Robert Barber would commit suicide. His death is indeed a sad and unfortunate occurrence. However, the failure to take special precautions in this case as to suicide prevention does not amount to a constitutional violation of deliberate indifference to Kenneth Robert Barber's serious medical needs. Moreover, where no constitutional violation exists for failure to take special precautions, none exists for failure to promulgate policies and to better train personnel to detect and deter jail suicides.

■ Finally, plaintiff argues that the City's failure to comply with state law is evidence of the City's deliberate indifference to decedent's due process rights. However, failure to comply with a state regulation is not itself a constitutional violation. *Roberts,* 773 F.2d at 726 (citing *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). In regard to this issue, it should be noted that because the City's actions or failure to act in the present case do not constitute deliberate indifference, there is no need to consider the issue of City policy under *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Furthermore, because the City is not liable under section 1983 in the present case, neither are the individual defendants in their official capacities.

## III.

For the foregoing reasons, we conclude that there are no genuine issues of material fact in this case, and we hold as a matter of law that defendants are entitled to summary judgment. Therefore, the judgment of the district court is AFFIRMED.