**Ruth Ann WILLIAMS, Personal Representative of the Estate of Anthony Wade, Deceased, Plaintiff,**

v.

**John JABE, et al., Defendants.**

No. 95–70665.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 25, 1996.

James W. McGinnis, Detroit, MI, for Plaintiff.

Erica Weiss Marsden, Asst. Atty. General, Lansing, MI, for Defendants Mehra, Cabrera and Rodriguez.

E. Michael Stafford, Asst. Atty. General, Lansing, MI, for Defendant Jabe and Hofbauer.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. BACKGROUND

Plaintiff, Ruth Ann Williams, is the personal representative of the estate of Anthony Wade ("Wade" or "decedent"), who committed suicide while imprisoned at the State Prison of Southern Michigan ("SPSM"). Three defendants, Dr. Mehra, Dr. Cabrera, and Dr. Rodriguez ("defendants" or "defendant psychiatrists"), are psychiatrists for the prison system who each evaluated the decedent at some point before his death while he was incarcerated.

Prior to his commitment at SPSM, Wade had been a pre-trial detainee in the Wayne County Jail for approximately 16 months while awaiting trial. There, he was diagnosed as suffering from clinical depression with psychotic features. In December 1992, he attempted suicide by overdosing on prescription drugs he had been given for his depression. He remained in a medical ward during his time in jail except when he was transferred to a psychiatric hospital when his psychiatric condition worsened. On August 19, 1993, he was convicted of second-degree murder and was transferred to SPSM the next day.

In his three months at SPSM, Wade was tested, interviewed, and analyzed by a number of therapists, including the three defendant psychiatrists. Notes from the therapists' interviews indicate that decedent was depressed, that he had attempted suicide, and that he recently attempted it by overdosing on depression medication provided to him at the jail. Nevertheless, he was provided medication in the same manner. He committed suicide with pills given to him on November 28, 1993.

Plaintiff filed an action in this court stating subject matter jurisdiction (42 U.S.C. §§ 1983, 1985, and 1988) and alleged claims of a denial of proper medical care and of negligent supervision in violation of the Eighth and Fourteenth Amendments of the

U.S. Constitution. She also filed state law claims of gross negligence and malpractice.

Defendant psychiatrists filed a motion for summary judgment claiming that no factual basis exists for the federal claims and thus a lack of pendent jurisdiction for the state claims.

The other defendants in this case, John Jabe, then-warden of SPSM, and Gerald Hofbauer, then-deputy warden of SPSM, have filed separate motions for summary judgment and are not subject to this motion.

For reasons set forth, defendant psychiatrists' motion for summary judgment is denied in part and granted in part.

## II. THE FEDERAL CLAIMS

### A. Summary Judgment Standard

Summary judgement is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Therefore plaintiff must produce more than a scintilla of evidence to overcome a motion for summary judgment. Id.

The moving party bears the burden of demonstrating the absence of all genuine issues of material fact. Gregg v. Allen–Bradley Co., 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to set forth specific facts showing a genuinely triable issue. Fed.R.Civ.P. 56(e). The court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor.

United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

### B. Deliberate Indifference

 "The proper inquiry ... under § 1983 for a jail detainee's suicide is: whether the decedent showed [to the defendants] a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." Barber v. City of Salem, 953 F.2d 232, 239–40 (6th Cir.1992), citing, Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). "Where prison officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment." Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir.1994).

In Farmer v. Brennan, 511 U.S. 825, ——, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994), the Supreme Court held that deliberate indifference requires that "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id., 511 U.S. at ——, 114 S.Ct. at 1978. Under this standard, "an official's failure to alleviate a significant risk that he should have perceived but did not" cannot be considered a violation of the Eighth Amendment. Id. If a prison official knows of a substantial risk of harm, but the harm occurs anyway, the official is not liable if he responds reasonably to that risk. Id., 511 U.S. at —— – ——, 114 S.Ct. at 1982–83.

Decedent's medical records reveal that he was depressed and that he had earlier attempted suicide by overdosing on pills he had hoarded that had been prescribed to him in jail for depression. The gist of defendants' argument is that there are no reliable predictors of suicide and that they evaluated Wade's medical condition and exercised their best clinical judgment in determining that he was not "actively suicidal." Plaintiff argues that decedent should have been given individual psychotherapy, placed on restrictions, or at least given medication in liquid form.

I conclude that a question of fact exists.

The Pre–Sentence Investigation Report was available to all three defendants and related personnel.[1] It stated:

> While in [Wayne County Jail], the defendant attempted suicide one week prior to Christmas, by taking 20 Thorazine tablets. He states that he did so, because he is locked up for something that he did not do. He further stated that he still thinks about suicide on occasion. He said, "I still think of suicide on occasion. I am going to prison for something I didn't do. I was trying to keep them from killing the girl."

Also in decedent's records was the Wayne County Discharge Planning–Referral form, dictated on September 7, 1993, which diagnosed decedent as suffering from "Major depression 296.3 with psychotic features." It indicated that at the time of his discharge, decedent repeated verbally his thoughts of suicide and quoted his feeling that "I may as well wait until after sentencing on Thursday."

Defendant psychiatrists also had available to them the notes taken by intake personnel and related therapists at SPSM. Upon entering SPSM on August 20, 1991, Wade was seen by a Michigan Department of Mental Health (MDMH) psychiatric nurse, Jeanne Keller, based upon his statement to an intake nurse that he had been taking Thorazine (an antipsychotic drug) for 13 months. Keller called the Wayne County jail and verified that Wade had been taking Sinequan (an anti-depressant), not Thorazine, and she initiated a prescription continuing the Sinequan pending examination by a psychiatrist. In a summary of her meeting with Wade, Keller reported that he denied any suicidal ideation.

As a part of intake procedure, decedent was given a written psychological test, which indicated that he was suffering from depression. He therefore was seen on August 25, 1993 by an institutional psychologist, Harold Duckworth, who reported that Wade's "anger is to the 'system' for convicting him of 'something I didn't do.'" Duckworth completed a form entitled "Evaluation of Suicide Risk Prisoner" where he recorded that Wade had no psychiatric history or suicide ideation or attempts.

On August 30, 1993 Wade was given a psychiatric interview by defendant Mehra. Dr. Mehra's "Comprehensive Psychiatric Evaluation" stated:

> This is a 31–year old single black male who is evaluated today because he was in the Wayne County Jail, and placed on medication at that facility for depression. On interview, the patient states that since being locked up in jail he began feeling depressed, unable to eat and unable to concentrate, and has sleeping difficulties. He states he was seen by the psychiatrist in the County Jail, and was put on Sinequan, 200 mg. h.s. He has been taking this medication since 2–93. On further interview, the patient states that while he was in the County Jail he began hearing voices of laughter of different people. He was placed on Thorazine. He said the voices ended, and he was placed on Sinequan because he was feeling depressed. The patient admits having heard voices while he was out in the community. He states the voices did not bother him, so he did not seek treatment.

Dr. Mehra therefore recommended that Wade be maintained on Sinequan 200 mg. for 30 days and that his medication be reviewed in 30 days. He had no further contact with Wade.

Maria Alcala–Cardew, another institutional psychologist who interviewed Wade because his psychological screening tests provided by the SPSM staff had been red-flagged, reported on September 2, 1996:

> County Discharge Planning Referral form were forwarded to SPSM from Wayne County Jail. Initial review of these reports is required in the intake screening process (Letter of Understanding between the Michigan Department of Corrections and the Michigan Department of Mental Health).

---

1. The three defendant psychiatrists are employed by the Michigan Department of Mental Health, whereas the intake personnel are employed by the Michigan Department of Corrections. Which files of the decedent were reviewed by whom is a source of dispute in this case, but defendants do concede in their reply brief that both the Pre–Sentence Investigation Report and the Wayne

[Wade's] psychological history consists of his being treated for depression while he was in the county jail. He was on Sinequan. His suicide history consists of his making a suicide attempt while in the county jail. He obtained some psychotropic medications by telling medical staff that he was hearing voices. He then used the psychotropic medications to overdose. He denies being suicidal currently stating that he has his mother, his brothers and sisters, his fiancee, and his daughter who are in support of him. He is also currently on Sinequan and being followed by the Outpatient Mental Health Team here at [the Reception and Guidance Center.

Under "Clinical Impressions," she concluded that decedent was "depressed" and was "a moderate potential risk for suicide." She recommended that he receive out-patient group therapy.

On September 3, 1993, Wade was transferred out of the intake unit and into the central prison population.

The psychiatrist assigned to Wade's Outpatient Treatment Team was defendant Cabrera, who had appointments with Wade on September 14, October 6, and November 2, 1993. His notes from the first meeting recount the following conversation and summary:

[Wade]: "yeah—I'm depressed (gets teary-eyed) the medication helps a little bit. I always been depressed ... they took me off the medications for over a week and I got extremely depressed. I didn't feel like getting up or eating or doing nothing. I'd hate to wake up every morning."

[Observation]: Denies suicidal ideas. Mood does seem depressed. Pt's in good touch with reality. Admits anger as much as depression. Takes Rx regularly wo side effects. Agreed to a trial with higher doses of Sinequan. Falls asleep til early in am. Requested max. dose.

Dr. Cabrera testified at his deposition that he prescribed an increase in Wade's anti-depressant medication from 200 m.g. to 300 m.g. per day because of his concerns about Wade's increasingly depressed mood on September 14, 1993.

The notes from Dr. Cabrera's October 6, 1993 meeting with decedent state:

[Wade]: It's alright ... still depressed ... I feel like I'm getting worse ... more & more depressed ... started to feel like I don't wanna live. (seems to be reacting to imprisonment of 25–60 year sentence).

[Observation]: He understood his depression is reactive nevertheless he is scared that he might attempt to commit suicide. He has no plans and doubts if he has "the heart" to do so. Has experienced more confusion and "roving" thoughts but he is still in good touch with reality. Claims he was depressed "all my life" and actually has attempted suicide 3rd time: one while in jail. He was 16–17 y.o. at his first attempt by hanging. "There was no reason. I never had the will to live." On that occasion the belt he was using broke down. The second time he took an O.D. More than once he contemplated shooting himself. Tried to inject some hope about using different antidepressants. Already used Prozac, Norpramin, Elavil and the only one that helped a bit was Sinequan. He is not having side effects and sleep is poor. Said he also used LCO3 and Sinequan

Dr. Cabrera's assessment of Wade's condition at that time was "severe depression." His treatment plan was to "switch gradually to another antidepressant. e.g. Asendin. Try both combined for a month."

Wade was then moved to a different cell block and was also switched to a different psychiatrist, defendant Rodriguez. After meeting with Wade on October 13, 1993, Dr. Rodriguez reported that "Suicidal thoughts have crossed his mind but he denies that he would harm himself because he cares about his family. Talked about several issues related to his long-term depression process. Willing to work on that in individual psychotherapy", which Dr. Rodriguez subsequently recommended.

Wade was seen by Dr. Cabrera, instead of Dr. Rodriguez, on November 2, 1993 because of a scheduling mistake. Dr. Cabrera noted Wade's statements and his observations:

It's alright. The medication makes me feel a little better. I don't have suicidal thoughts that often. I still sleep off and on. When I sleep good I feel good. Appetite seems improved. Affect less gloomy. Does not feel less depressed ... Says he noticed a change for the better about 2½ weeks after beginning Sinequan plus asendin. Says anger not improved. A bit less confused ...

Dr. Cabrera's assessment was that Wade's condition seemed to be improving.

Dr. Rodriguez wrote after his November 15 appointment with Wade:

[Wade]: "How come I was so damn stupid." Pt. stated his main problem. He's locked up for something he didn't do. Feels nobody can change his situation. Expressed feelings and emotions about the whole process that brought him here. Repeated the medication helps him to be relax & less depressed.

Dr. Rodriguez concluded: "No suicidal thoughts." He ordered the anti-depressant Sinequan to be continued at the same level and a return appointment in one month.

The final therapist to see Wade before his death was James Little, a psychiatric social worker. He wrote in Wade's records on November 22, 1993:

"I still feel like I want to kill myself." A pt's effect is flat—depressed—not doing very well—Pt feels sleeping O.K. Very angry about being incarcerated, denies he committed the offense—Pt continues to have contact w/support systems eg. s.o., with daughter and sister.... Discuss the importance of letting himself adjust to his incarceration before going ahead with suicide plan.

On November 28, 1993, Wade killed himself by overdosing on the pills prescribed to him to control his depression.

■ With the benefit of hindsight, it is clear that decedent was a suicide risk; such a determination is based on a myriad of factors which naturally becomes more obvious after suicide occurs. While I am reluctant to second-guess defendants' clinical judgments, I do find that plaintiff has alleged sufficient facts to raise a genuine question whether defendants' actions constitute deliberate indifference.

The Supreme Court's inquiry in *Farmer, supra,* as to the meaning of deliberate indifference focuses on whether a defendant should have objective knowledge of the substantial risk of serious harm (the civil law standard) or whether the defendant should possess subjective knowledge of the substantial risk (the criminal law standard). *Id.,* 511 U.S. at ——–——, 114 S.Ct. at 1978–79. The Court adopted the subjective test, reasoning that "an official's failure to alleviate a significant risk that he should have perceived but did not ... cannot under our cases be condemned as the infliction of punishment" in violation of the Eighth Amendment. *Id.,* 511 U.S. at ——, 114 S.Ct. at 1979.

This standard was put into practical terms by Chief Judge Richard Posner of the U.S. Court of Appeals for the Seventh Circuit:

[T]o be guilty of "deliberate indifference" [prison officials] must know they are creating a substantial risk of bodily harm. If they place a prisoner in a cell that has a cobra, but they do not know that there is a cobra there (or even that there is a high probability that there is a cobra there), they are not guilty of deliberate indifference even if they should have known about the risk, that is, even if they were negligent—even grossly negligent or even reckless in the tort sense—in failing to know. *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). But if they know that there is a cobra there or at least that there is a high probability of a cobra there, and do nothing, that is deliberate indifference.

*Billman v. Indiana Dept. of Corrections,* 56 F.3d 785, 788 (7th Cir.1995).

The cobra in this case is decedent's risk of killing himself, and the issue is whether defendants knew of this risk when they prescribed medication to him in pill form.

Defendants were aware that his most recent suicide attempt occurred less than a year earlier in this exact manner, and that he had attempted suicide at least twice before. In addition to this history, decedent repeatedly made references to a suicide plan. Remarks included statements such as, "[he]

started to feel like he doesn't want to live"; "I still feel like I want to kill myself"; and "I never had the will to live". These, along with his history of suicide attempts, make his declarations that he doesn't think he has the heart to kill himself unconvincing. Defendants were not only aware of his method of attempting suicide in the past but were also aware of his thoughts about suicide during their treatment of him. A jury could therefore find that defendants knew of the risk of his committing suicide with the pills and that their treatment of him constituted deliberate indifference.

The defendants argue that, as in *Barber v. City of Salem*, 953 F.2d 232 (6th Cir.1992), there was no evidence of a strong likelihood that plaintiff's decedent was on the verge of harming himself when treated by the defendants, and each of the psychiatrist defendants is therefore entitled to summary judgment. *Barber*, however, involved entirely different factual circumstances. The decedent in that case hanged himself in a jail cell within hours of being arrested for driving under the influence of alcohol and after expressing concern that his arrest would cause him to lose his girlfriend, his job, and custody of his son. This case is clearly distinguishable, as drunken declarations about the severity of an arrest made to police officers untrained in and not responsible for providing psychiatric evaluations are less foreboding than repeated suicidal statements and attempts made known to trained psychiatrists at issue here.

### C. *Negligent Supervision*

■ Plaintiff also presents a claim of negligent supervision against the defendant psychiatrists. To impose supervisory liability, there must be a showing that defendants "either encouraged the specific incident or in some other way directly participated in it." *Bremiller v. Cleveland Psychiatric Institute*, 879 F.Supp. 782 (N.D.Ohio 1995), *citing Hays v. Jefferson County*, 668 F.2d 869 (6th Cir.) *cert. denied*, 459 U.S. 883, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). Liability under a § 1983 claim cannot be based on *respondeat superior*. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984).

Defendants argue that, as staff psychiatrists employed by the Michigan Department of Mental Health, they were responsible solely for providing psychiatric evaluation and treatment. According to defendants, they had no supervisory authority over the staff at SPSM nor did they have authority to promulgate policies regarding prisoners.

Plaintiff argues that defendants, as heads of multidisciplinary teams comprised of nurses, psychologists and social workers, knowingly acquiesced in the failure of the intake personnel to complete the suicide screening form as required by department policy, to read decedent's pre-sentence report, to correctly use the criteria to assess decedent's suicide risk after test results indicated he was suffering from depression, and to make a recommendation for individual psychotherapy because of the nature of decedent's crime—even though it was ordered by Dr. Rodriguez after his October 13, 1993 consultation.

The basis of plaintiff's contention is a letter of understanding between the Michigan Department of Corrections and Michigan Department of Mental Health that lays out in extensive detail the responsibilities of employees for each of these departments to ensure that the psychological needs of prisoners are met. It states:

DOC PSYCHOLOGICAL SERVICES staff play a key role in the identification, referral and aftercare of prisoners entering and exiting DMH–OPERATED MENTAL HEALTH PROGRAMS. It is acknowledged that one of the roles of DOC PSYCHOLOGICAL SERVICES staff is to serve as "first time responders" for prisoners suspected of manifesting mental illness. For prisoners not yet receiving services in a DMH–OPERATED MENTAL HEALTH PROGRAM, DOC PSYCHOLOGICAL SERVICES staff provide initial assessment and referral for evaluation by

DMH–OPERATED MENTAL HEALTH PROGRAM staff.

Plaintiff Ex. 12 at 1–2. The agreement also provides that "commitment papers, court documents, PSI reports, jail records, confinement records, and all other pertinent documents which accompany an incoming prisoner" must be reviewed by the reception center as part of intake screening. *Id.* at 4. "If suicide prevention screening suggests that a prisoner may be a high risk for suicide, an *immediate* referral for evaluation of suicide risk must be made to DMH OUTPATIENT MENTAL HEALTH TEAM staff." *Id.* at 5 (emphasis in the original).

The agreement illustrates well the interplay between the defendant psychiatrists and the intake personnel, and it envisions a coordinated system of service. Defendants' ability to perform their services adequately depended on the information provided to them by intake personnel. The degree to which the knowingly ignored a lack of necessary information goes directly to the issue of their deliberate indifference.

■ The agreement does not illustrate whether the defendant psychiatrists had any supervisory responsibilities over the intake personnel or power to promulgate policies or procedures. Since such a showing is required in order to establish that defendants approved of or acquiesced in the allegedly unconstitutional conduct of intake personnel, defendants' motion for summary judgment on the issue of negligent supervision is granted.

### III. *THE STATE LAW CLAIMS*

#### A. *Supplemental Jurisdiction*

Having found a sufficient basis for plaintiff's federal claims continue, it is necessary to determine whether an exercise of supplemental jurisdiction over her state law claims is appropriate.[2] The doctrine of supplemental jurisdiction is a doctrine of judicial discretion whose justification lies in "considerations of judicial economy, convenience and fairness to litigants." *United Mine Workers v. Gibbs,*

383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The prerequisites for supplemental jurisdiction are (1) the federal claim must have substance sufficient to confer subject matter jurisdiction of the court; (2) the state and federal claims must derive from a common nucleus of operative fact; and (3) the plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding. *Gaff v. Federal Deposit Ins. Corp.,* 814 F.2d 311, 319 (6th Cir.1987).

A district court may decline to exercise supplemental jurisdiction if there are compelling reasons for doing so. 28 U.S.C. § 1367(c). One compelling reason is the possibility of jury confusion in cases alleging federal claims under 42 U.S.C. § 1983 and similar state law claims. *Moor v. County of Alameda,* 411 U.S. 693, 716–17, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973); *Padilla v. City of Saginaw,* 867 F.Supp. 1309, 1315 (E.D.Mich.1994).

■ In this case, defendants could be considered grossly negligent and/or deliberately indifferent and liable on the federal claim. Adding to this is the possibility of finding defendants liable for medical malpractice, which involves an entirely different standard of care. Although the potential for jury confusion exists, it can be prevented by application of a special verdict.

I find that the potential for jury confusion is out-weighed by the need to avoid the unnecessary duplication of efforts by both parties in the state courts. For similar holdings, see *Sirota v. Welbilt Appliance, Inc.,* 840 F.Supp. 11, 14 (E.D.N.Y.1994); *Bridges v. Eastman Kodak Co.* 800 F.Supp. 1172, 1178–79 (S.D.N.Y.1992). I therefore exercise supplemental jurisdiction over the state law claims as the most just and expeditious resolution of this case.

#### B. *Gross Negligence*

Government employees acting within the scope. of their. duties are accorded immunity from liability for tort claims in Michigan

---

2. I use the term "supplemental jurisdiction" consistent with congressional intent in enacting 28 U.S.C. § 1367 to codify the case-law doctrines of "pendent" and "ancillary" jurisdiction under one name.

unless their conduct amounts to "gross negligence." M.C.L. § 691.1407. Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L. § 691.1407(2)(c). This statutorily-created standard for gross negligence does not codify the common law, but instead represents a new standard for the liability of government officials.[3]

■ In *Dedes v. Asch*, 446 Mich. 99, 521 N.W.2d 488 (1994), the Supreme Court looked to cases before the enactment of the statute to flush out the statutory meaning of gross negligence:

> One who is properly charged with recklessness or wantonness is not simply more careless than one who is only guilty of negligence. His conduct must be such as to put him in the class with the willful doer of wrong. The only respect in which his attitude is less blameworthy than that of the intentional wrong-doer is that, instead of affirmatively wishing to injure another, he is merely willing to do so. The difference is that between him who casts a missile intending that it shall strike another, and him who casts it *where he has reason to believe it will strike another*, being indifferent whether it does so or not.

*Id.* at 110–111, 521 N.W.2d 488 (emphasis added), *citing Gibbard v. Cursan*, 225 Mich. 311, 196 N.W. 398 (1923). This type of indifference does not require subjective knowledge of a substantial risk of harm on the part of the wrong-doer. Instead, it imposes an objective standard, requiring only that the wrong-doer had reason to know of the substantial risk of harm. As such, the Michigan standard for gross negligence does not rise to the level of criminal recklessness required for a federal claim of deliberate indifference, but instead comports with the traditional civil law standard of recklessness.

Having decided that plaintiff has met her burden of proof to establish a genuine issue of material fact for a claim of deliberate indifference, *a fortiori*, I also find a genuine question of material fact exists for her state law claim of gross negligence.

### C. *Medical Malpractice*

■ Defendants also argue that plaintiff's medical malpractice claim fails because plaintiff did not give written notice of this claim to defendant 182 days before filing suit pursuant to M.C.L. § 600.2912b(1) and did not attach an affidavit of a health professional substantiating her claim as required by M.C.L. § 600.2912d. Each of these statutes became effective April 1, 1994. Plaintiff's decedent committed suicide on November 28, 1993. The statute does not require retroactive application, and defendant presents no arguments why it should be applied retroactively.

Since a statute should be applied prospectively in the absence of legislative intent to the contrary (*Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)), M.C.L. §§ 600.2912b(1) and 600.2912d do not act as a bar to plaintiff's claim which arose before their enactment.

### IV. *CONCLUSION*

**IT IS ORDERED,** for the reasons stated above, that defendant psychiatrists' motion for summary judgment of plaintiff's § 1983 claim of a denial of medical care is denied.

**IT IS FURTHER ORDERED** that defendant psychiatrists' motion for summary judg-

---

3. The change in law is well-summarized as follows:

> Due partly to the inherent confusion in having to distinguish discretionary acts from ministerial acts under the test in *Ross v. Consumers Power Co. (On rehearing)*, 420 Mich. 567, 363 NW2d 641 (1984), the Michigan legislature drastically changed the law of individual immunity for lower officials, employees, and agents for all cases arising on or after July 1, 1986. MCLA 691.1407(2), MSA 3.996(107)[2] as amended creates a new standard for individual immunity. The new statutory immunity does not codify the existing common-law immunity as articulated in *Ross*. Rather, it sets a different standard, that of statutory gross negligence. MCLA 691.1407(2), MSA 3.996(107)[2]. Although the various components of this new test have recognizable antecedents in earlier law, this statutory source of immunity for individual governmental employees and officials is new and without precedent in Michigan law.

Ronald E. Baylor, *Governmental Immunity in Michigan*, The Institute of Continuing Legal Education, § 5.10 at 5–14 (1991).

ment of plaintiff's § 1983 claim of negligent supervision is granted.

**IT IS FURTHER ORDERED** that plaintiff's state law claims are not dismissed against defendant psychiatrists.