Nancy L. **ELLIS,** individually and as next friend of Catherine E. Lanthorn, Plaintiffs,

v.

WASHINGTON COUNTY, TENNESSEE; Sheriff Ron England, in his official capacity; R.D. Jamerson, individually and in his official capacity; Billy Mitchell, individually and in his official capacity; Johnson City, Tennessee; Chief of Police Ron Street, in his official capacity; and Sam Garland, individually and in his official capacity, Defendants.

No. 2:95–CV–325.

United States District Court, E.D. Tennessee at Greeneville.

Jan. 27, 1998.

Mark C Hicks, Jr, Washington County Attorney, Jonesborough, TN, for Defendant.

Wanda G. Sobieski, Sobieski, Messer & Associates, Knoxville, TN, for Plaintiff.

## MEMORANDUM

COLLIER, District Judge.

This case centers around the death of Craig Lanthorn, Plaintiff Nancy L. Ellis's son and Plaintiff Catherine E. Lanthorn's father. Mr. Lanthorn committed suicide while held in the Washington County jail. Plaintiffs bring federal civil rights claims based on 42 U.S.C. § 1983, as well as wrongful death claims based on state law.

Each of the Defendants has filed a summary judgment motion. (Johnson City, Court File No. 93; Mitchell, Court File No. 96; Jamerson, Court File No. 98; Washington County, Court File No. 102; Garland, Court File No. 106). Plaintiffs have filed a sixty-seven page collective response to these motions (Court File No. 124), and Defendants have filed separate replies (Mitchell, Court File No. 138; Jamerson, Court File No. 144; Garland, Court File No. 145; Washington County, Court File No. 148; Johnson City, Court File No. 149). Plaintiffs have also filed a separate supplemental response with respect to each defendant (Court File Nos. 152, 155, 156, 157, 158), and Defendants have replied in kind (Mitchell, Court File No. 159; Johnson City, Court File No. 161; Jamerson, Court File No. 162; Garland, Court File No. 171; Washington County, Court File No. 174).[1]

For the following reasons, the Court will **GRANT** the summary judgment motions of Defendants Washington County, Johnson City, Garland, and Mitchell to the extent they seek dismissal of Plaintiffs' § 1983 claims, **DENY** Defendant Jamerson's summary judgment motion with respect to Plaintiffs' § 1983 claim, and defer ruling on the portions of Defendants' summary judgment motions dealing with Plaintiffs' state law claims.

## I. STANDARD OF REVIEW

Although some Defendants have argued Plaintiffs' claims should be dismissed pursuant to *Fed.R.Civ.P.* 12(b)(6), all parties have submitted extensive evidence outside the pleadings. Therefore, the Court will review all motions under the summary judgment standard. *Fed.R.Civ.P.* 12(b).

Under *Fed.R.Civ.P.* 56(c), the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir.1994); *Kentucky Div., Horsemen's Benev. & Prot. Assoc., Inc. v. Turfway Park Racing Assoc., Inc.,* 20 F.3d 1406, 1411 (6th Cir.1994), and the Court must

1. Defendants have moved to strike Plaintiffs' supplemental responses. Because Defendants have availed themselves of the opportunity to file supplemental replies, which the Court has considered, the Court hereby **DENIES** the motion to strike. However, the Court dis-courages the parties from utilizing this ping pong briefing strategy in the future. The interests of their clients would be better served by one well written and annotated memorandum discussing all relevant issues.

view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *In re Julien Co.*, 44 F.3d 426, 429 (6th Cir.1995); *City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 250 (6th Cir.1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benev.*, 20 F.3d at 1411; *see also Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404–06 (6th Cir.1992) (holding courts do not have the responsibility to search *sua sponte* the record for genuine issues of material fact). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435–36 (6th Cir.1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could

not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benev.*, 20 F.3d at 1411.

## II. *FACTUAL ALLEGATIONS*

Viewing the evidence in the light most favorable to Plaintiffs, the facts are as follows. On August 2, 1994, Johnson City police officer Tim Hensley arrested Craig Lanthorn for public intoxication and criminal trespassing. (Complaint, Court File No. 1, ¶ 12). Officer Hensley responded to a call to the home of Dr. James Turnbull, the father of Sarah Turnbull, Lanthorn's former girlfriend. Officer Hensley transported Lanthorn to the Johnson City jail.

Lara Bolton was the "booking" officer at the Johnson City jail. According to Officer Bolton, Lanthorn was highly intoxicated, slurred his speech, had a sloppy gait, was "kinda dirty," was "all over the counter," and was wearing a toboggan and long sleeved shirt in August. (Bolton Depo., Court File No. 124, pp. 29–30, 60). Officer Bolton also described Lanthorn as "disoriented" and "not fully alert." (*Id.* at 61–62, 77). On Lanthorn's booking card, Officer Bolton noted Lanthorn was under treatment for anxiety and seizures, taking the prescription medication Klonopin, and under the care of a particular physician. (*Id.* at 33). Officer Bolton did not attempt to contact Lanthorn's physician or check on his medication. (*Id.* at 33–34). After the booking was complete, Lanthorn was placed in the "drunk tank."

Sometime later, Officer Bolton heard noise coming from Lanthorn's cell and asked Officer Sam Garland, one of the defendants in this case, to check on Lanthorn. (*Id.* at 38). Defendant Garland found Lanthorn lying on his back in the cell, kicking and screaming that he was having a seizure and wanted to go to the hospital. (Garland Depo., Court File No. 124, pp. 45, 48, 56–57, 139). In a statement to the Federal Bureau of Investigation, Garland described Lanthorn as "kick-

ing uncontrollably" and "flopping his body about in a wild manner." (Exh. I, Court File No. 124). In his deposition, Garland indicated he thought Lanthorn was "not all there" during this kicking episode in the drunk tank. (Garland Depo., Court File No. 124, p.p. 144–45).

Garland told Officer Bolton to call the Rescue Squad, went back to his office, and a few minutes later heard noise coming from Lanthorn's cell again. (*Id.* at 50–51). According to Garland, he went to Lanthorn's cell, opened the door, and Lanthorn kicked him. (*Id.* at 51). Garland avers he placed his foot between Lanthorn's ankle and shin and told Lanthorn to calm down. (*Id.* at 51–53). At the time of this incident, Garland weighed 380 pounds. (*Id.* at 55).

Garland admits, when the Rescue Squad arrived, Lanthorn told them he had been kicked in the back by an officer. (*Id.* at 63–64). Doug Green, the emergency medical technician who responded to Officer Bolton's call, completed a report which states in relevant part:

> Upon arrival found pt sitting in fetal position in jail cell. Officer S. Garland stated pt was laying in floor kicking and foaming @ mouth. Upon exam found pt alert but very anxious. Pupils were equal and reactive, skin was dry, warm, normal in color. Pt had smell of ETOh on breath. Advised pt to slow down his respirations. Pt stated he had hx of anxiety attacks. Advised *Officer S. Garland* to contact pt physician to advise on situation.

(Exh. H, Court File No. 124).

Green testified he told Garland to call Lanthorn's physician "[t]o check on his medications to see if he needed his medications to keep his therapeutic levels up." (Green Depo., Court File No. 124, p. 52). Green further testified he offered to transport Lanthorn to the hospital, but Lanthorn refused transport and requested medication. (*Id.* at 52–54). Plaintiffs point out, however, Garland signed the Rescue Squad form on a line reserved for a patient or surrogate to refuse transport

by ambulance and release all claims against the Rescue Squad. (Exh. H). According to Garland, the Rescue Squad indicated Lanthorn was not having a seizure, but Garland should keep an eye on Lanthorn and call the Rescue Squad back if his condition changed. (Garland Depo., Court File No. 124, pp. 67–68).

The following day, Garland took Lanthorn to a hearing before a judge. Garland testified Lanthorn told the judge "[h]e had been beat up twice by two officers." (*Id.* at 124). Lanthorn apparently did not specify where or when the beatings took place. (*Id.*). Garland also testified Lanthorn, during the previous night, had torn up a phone book and scattered it all over his cell. (*Id.* at 118).

After his appearance before the judge, Garland took Lanthorn to the booking office to be prepared for transport to the Washington County jail. Garland witnessed other transportees teasing Lanthorn about "going to the big house." (*Id.* at 129–30). Lanthorn was transported to the Washington County jail on August 3, 1994.

Hubert Castle was the desk officer on duty when Lanthorn came into the Washington County jail. When Lanthorn came in the door, Castle had to "call him down" because he was "jumping up and down." (Castle Depo., Court File No. 124, p. 44). Lanthorn was "very upset" because he believed his wallet had not been returned when he left the Johnson City jail. (*Id.* at 44–45). According to Castle, Lanthorn calmed down after Castle instructed him to do so. (*Id.* at 45).

The transporting Johnson City officer asked Castle if anyone had called about Lanthorn. (*Id.* at 46–47). Castle replied in the negative and asked "if there was a potential problem." (*Id.* at 47). The Johnson City officer did not "really know" what the problem was, but indicated someone from Johnson City would call. (*Id.*).[2]

---

2. Castle never received a call from Johnson City. (*Id.*).

Lanthorn was then taken upstairs to the booking officer, Wanda Robertson. According to Robertson, Lanthorn was "unkept, hair not combed, maybe not shaved, clothes rumpled." (Robertson Depo., Court File No. 124, p. 48). Robertson also testified Lanthorn stated a Johnson City jailer told him he would be "locked down with nothing" because he was yelling; asked if he would actually be locked down with nothing; and stated he was "not suicidal," "loved life," and wanted a cigarette.[3] (*Id.* at 51–53). Robertson noted Lanthorn appeared disoriented, was agitated, appeared to be under the influence of alcohol or drugs, and was unsteady on his feet. (*Id.* at 58–59, 110–11). Lanthorn told Robertson he was on medication for panic attacks, seizures, and nerves, and that he was under the care of Dr. Patel and Dr. Finley. (*Id.* at 70–71). After the booking interview, Robertson assigned Lanthorn to cell T–3, the suicide watch cell. (*Id.* at 68, 74).

While the booking interview was conducted upstairs, Defendant Billy Mitchell came in downstairs. Approximately three weeks earlier, Mitchell had transported Lanthorn to Lakeshore Mental Hospital for an involuntary commitment. Mitchell picked Lanthorn up at the Medical Center emergency room, put leg irons on him, and took him to Lakeshore. (Mitchell Depo., Court File No. 124, pp. 56–59). During the transport, Lanthorn told Mitchell he had been raped, his girlfriend was pregnant, and he had thoughts of hurting himself, but did not want to do so. (*Id.* at 60–61, 68–69). According to Mitchell, the doctors at Lakeshore evaluated Lanthorn and said they were going to keep him, so

Mitchell took his leg irons and went home. (*Id.* at 61).[4]

After Mitchell came in downstairs, he heard Hubert Castle and Sergeant R.D. Jamerson, Mitchell's superior officer and a defendant in this case, discussing the inmates Johnson City had brought over that day. When Craig Lanthorn's name was mentioned, Mitchell told Jamerson he had transported Lanthorn to Lakeshore approximately one month earlier and that Lakeshore "kept" Lanthorn. (*Id.* at 70). Mitchell also told Jamerson that, during the transport to Lakeshore, Lanthorn told Mitchell "he wasn't really trying to kill himself; that he just wanted some help." (Jamerson Depo., Court File No. 124, p. 42). According to Mitchell, Hubert Castle then mentioned the Johnson City jail had "problems" with Lanthorn because he was "screaming and hollering." (Mitchell Depo., Court File No. 124, pp. 73–74).

At that point, Jamerson directed Mitchell to go upstairs and determine whether Lanthorn needed to be on suicide watch or could be placed in cell B–4, the cell that was least full that day. (*Id.* at 75–78). Mitchell went upstairs to speak with Lanthorn, but Lanthorn was on the phone with his mother, was upset, and appeared to have been crying. (*Id.* at 81–82).

Several minutes later, after Lanthorn had been placed in a holding cell, Mitchell returned to speak with him. According to Mitchell, he asked Lanthorn if he was suicidal, and Lanthorn replied, "H——, no. I love life. I've got a baby on the way that I've got to take care of." (*Id.* at 83). Lanthorn also asked Mitchell about the

---

3. Robertson explained:

 Locked down with nothing probably referred to what he said Johnson City had told him, which is what they say with a suicide cell. You're locked down and not given anything. You can't have anything other than the basics, a mat and a blanket, a sheet, whatever.

 (*Id.* at 52). Robertson further explained "locked down with nothing" could also refer to a "disciplinary cell." (*Id.* at 53).

4. Plaintiffs assert Mitchell, in a statement to the Tennessee Bureau of Investigation ("TBI"), admitted a nurse at Lakeshore told him Lanthorn was being committed because he was suicidal. (*See* Court File No. 124, p. 9 and Exh. E). The Court notes, however, the TBI report indicates Mitchell stated a nurse in the Medical Center emergency room told him "Lanthorn wanted to hurt himself." (*Id.* at Exh. E).

charges he was facing and asked to be placed in a smoking cell. (*Id.* at 87–89).

At that point, without reviewing the booking card or discussing Lanthorn's condition with Robertson, Mitchell told Officer John Cline that Lanthorn could go to cell B–4. (*Id.* at 88–89). According to Robertson, Mitchell told her Lanthorn would be "okay" in B–4 with the camera. (Robertson Depo., Court File No. 124, p. 76).

Lanthorn was placed in cell B–4, which was equipped with a camera. The camera was not monitored at all times. In contrast, the suicide watch cell, T–3, was monitored at all times by a trustee inmate. (Mitchell Depo., Court File No. 124, pp. 22, 30, 34–36).

Hubert Castle was stationed in the room with the monitor for the B–4 camera. According to Castle, it had been at least fifteen or twenty minutes since he looked at the monitor when Jamerson came into the room and told Castle there was something going on in B–4. (Castle Depo., Court File No. 124, pp. 51–53). Castle then looked at the monitor and saw Lanthorn hanging from a horizontal bar above the door to his cell. (*Id.* at 51–52). The noose around Lanthorn's neck had been fashioned from a bed sheet.

Plaintiffs contend Jamerson saw Lanthorn tie the noose around the bar at 1:45 p.m., but an emergency medical team was not called until 1:56 p.m. (Court File No. 124, pp. 26–27). Plaintiffs also contend Jamerson did not notify other jailers of the problem until 1:55 p.m. Lanthorn died at the hospital the next day, August 4, 1994.

### III. OFFICIAL CAPACITY CLAIMS

■ The individual Defendants argue all claims against them in their official capacity should be dismissed. The Court notes a suit against an individual in his official capacity is the equivalent of a suit against the governmental entity employing him. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir.1994); *Barber v. City of Salem, Ohio*, 953 F.2d 232, 237 (6th Cir.1992). Therefore, Plaintiffs' official capacity claims will

be resolved by the Court's decision regarding Washington County and Johnson City.

### IV. SECTION 1983

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. ...

42 U.S.C. § 1983 (Supp.1997). "To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of law." *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir.1994) (citation omitted). Thus, an important threshold step in analyzing Plaintiffs' claims is determining what constitutional rights Plaintiffs allege Craig Lanthorn was denied.

■ The United States Supreme Court has determined pretrial detainees such as Lanthorn are entitled to the same constitutional rights as convicted prisoners. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Prisoners have an Eighth Amendment right to be free from cruel and unusual punishment. Therefore, prisoners have a right to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Although this Eighth Amendment analysis is not applicable to detainees, they have an analogous right. *Danese v. Asman*, 875 F.2d 1239, 1242–43 (6th Cir. 1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990). "[U]nder due process of law, pretrial detainees may not be punished because they have not yet been judged guilty." *Id.* at 1242. Therefore, "jail officials violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees that is tantamount

to an intent to punish." *Id.* at 1243. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Oklahoma v. Brown,* 117 S.Ct. at 1391.

■ The Supreme Court has also determined prisoners have a liberty interest in personal security and a due process right to be free from unjustified intrusions on personal security. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982). Consequently, the Constitution requires jail officials to exercise professional judgment as to the conditions of a prisoner's confinement, *id.* at 2462, 102 S.Ct. 2452. Finally, the Supreme Court has recognized a pretrial detainee's right to be free, *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 1869–71, 104 L.Ed.2d 443 (1989) and to refrain from the use of excessive force. With these basic rights in mind, the Court will address Plaintiffs' specific claims against the individual defendants before turning to Plaintiffs' claims against Johnson City and Washington County.

## A. Individual Liability

■ Each of the individual Defendants contends Plaintiffs' § 1983 claim against him should be dismissed because he is entitled to qualified immunity. "A government official performing a discretionary function is entitled to qualified immunity in his personal capacity where the official's action (or failure to act) does not violate constitutional standards in light of clearly established law at the time the official acted." *Barber v. City of Salem,* 953 F.2d 232, 236 (6th Cir.1992).

The United States Supreme Court has succinctly explained the policy underlying qualified immunity:

When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald,* 457 U.S., at 814, 102 S.Ct., at 2736. On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. *Ibid.* Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

The Court further explained qualified immunity analysis must focus on a particularized constitutional right:

[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, *Harlow,* 457 U.S., at 819, 102 S.Ct., at 2739, assessed in light of the legal rules that were "clearly established" at the time it was taken, *id.,* at 818, 102 S.Ct., at 2738. The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by

alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 107 S.Ct. at 3038–39 (citations and footnote omitted).

The United States Court of Appeals for the Sixth Circuit has applied this particularized right principle in a jail suicide case. In *Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir.1989), the plaintiff asserted two causes of action against individual officers: (1) "deprivation of Danese's fourteenth amendment due process right not to be punished while in pretrial detention" based on deliberate indifference to medical needs and (2) "deprivation of a fourteenth amendment due process right to be free from unsafe confinement."

Danese was arrested for driving while intoxicated. He "cried intermittently and made repeated remarks ... that he wished he were dead." *Id.* at 1241. "Danese called his mother, and one of the officers noticed that Danese cried toward the end of the call." *Id.*

The jail officials removed Danese's belt and shoes and placed him in a cell which had horizontal bars and an inoperative television monitor. Between 5:15 and 5:25 a.m., an officer heard screaming and banging coming from Danese's cell. Danese asked for a cigarette, but the officer told him it was against jail rules. Danese replied "he would hang himself if he did not get one." *Id.* The officer said he was sorry and left.

At 5:56 a.m., Danese was found hanging by his shirt from a bar in his cell. The officers cut Danese down and summoned an ambulance, but Danese was dead within an hour.

The *Danese* court found the asserted rights to medical care and safe confinement were not particularized rights as required by *Anderson* and reasoned:

> The "right that is truly at issue here is the right of a detainee to be screened correctly for suicidal tendencies and the right to have steps taken that would have prevented suicide. The general right to medical care, for example, is not sufficient to require a police officer to have known that he was seriously contemplating suicide and stop him from following through."

*Danese,* 875 F.2d at 1244. Because the court found there was no clearly established right to suicide prevention screening or facilities as of November 1982, it concluded the police officers were entitled to qualified immunity. *See Barber,* 953 F.2d at 236–37 (interpreting *Danese* ).

The court recognized, however, "[t]he story might be different if the police were certain that Danese would attempt suicide and just ignored it, or if Danese had told them he needed psychological help. If a prisoner asks for and needs medical care, it must be supplied." *Danese,* 875 F.2d at 1244; *see also Horn v. Madison County,* 22 F.3d 653, 660 (6th Cir.1994), *cert. denied,* 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994). ("A detainee's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies.... Knowledge of the asserted serious needs or of circum-

stances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.").

In a later case, the Sixth Circuit explained:

[T]he proper inquiry concerning the liability of a City and its employees in both their official and individual capacities under section 1983 for a jail detainee's suicide is: whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.

*Barber,* 953 F.2d at 240.

The Sixth Circuit has also established a burden shifting paradigm with respect to qualified immunity:

The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. *Wegener v. Covington,* 933 F.2d 390, 392 (6th Cir.1991). Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question. *Id.* Thereafter, the burden shifts to the plaintiff to establish that the defendants' conduct violated a right so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct.

*Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992).

Thus, as a preliminary matter, the Court must decide whether Defendants were performing discretionary acts. Discretionary acts involve "significant decision-making that entails personal deliberation, decision and judgment." *Davis v. Holly,* 835 F.2d 1175, 1178 (6th Cir.1987) (noting defendants, in carrying out responsibilities of providing proper care and treatment, safe conditions of confinement, and personal security to mental hospital patients were "'almost inevitably ... influenced by [their] experiences, values, and emotions'"

and therefore performed discretionary functions) (citation omitted). In contrast, ministerial acts involve "the execution of or implementation of a decision and entail only minor decision-making." *Id.; cf. Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir.1991) (finding nurse's compliance with doctor's prescription or treatment plan ministerial).

In determining whether Lanthorn needed medical care or needed to be placed in a suicide watch cell, Defendants exercised significant decision making authority. Their acts entailed personal deliberation, decision, and judgment. Therefore, the Court finds Defendants Garland, Mitchell, and Jamerson were performing discretionary functions.

Having determined Defendants have carried their initial burden, Plaintiffs must carry the ultimate burden of showing Defendants violated a clearly established right. Plaintiffs contend Defendants Jamerson, Mitchell, and Garland were deliberately indifferent to Lanthorn's serious need for medical or psychological care. Additionally, Plaintiffs contend Defendant Garland violated Lanthorn's right to be free from the use of excessive force. For ease of discussion, the Court will address Plaintiffs' claims against each defendant separately.

### 1. Billy Mitchell

According to Plaintiffs, Mitchell was deliberately indifferent to Lanthorn's need for medical and psychological care because Mitchell knew he had transported Lanthorn to Lakeshore three weeks earlier for an involuntary commitment; at the time of the transport, Lanthorn told Mitchell he had been raped and had thoughts of hurting himself; Mitchell was aware of Lanthorn's domestic problems; Mitchell was aware Lanthorn had been crying and seemed upset and nervous; and Mitchell placed Lanthorn in cell B–4 without discussing Lanthorn's condition with Wanda Robertson, reviewing the booking card, or asking the facility nurse to exam-

ine Lanthorn. (Plaintiffs' Response, Court File No. 124, p. 42–46; Plaintiffs' Supplemental Response, Court File No. 156).

Plaintiffs have offered no evidence disputing Mitchell's contention he asked Lanthorn if he was suicidal, nor have Plaintiffs introduced evidence Lanthorn told Mitchell he was suicidal while he was in the Washington County jail or Lanthorn asked Mitchell for any type of medical care.

The Court finds Lanthorn did not exhibit to Mitchell such a strong likelihood he would attempt to take his own life that failure to take adequate precautions amounted to deliberate indifference. Viewing all Plaintiffs' evidence in the most favorable light, the most that can be said about Mitchell is he knew Lanthorn had been suicidal in the recent past. In contrast, the defendants in *Danese* were entitled to qualified immunity even though the decedent threatened suicide while he was in jail. Consequently, the Court finds Mitchell is entitled to qualified immunity and will **DISMISS** Plaintiffs' § 1983 claim against Mitchell in his individual capacity.

### 2. R.D. Jamerson

■ Plaintiffs allege Jamerson was deliberately indifferent to Lanthorn's medical needs because he was aware Mitchell had transported Lanthorn to Lakeshore due to suicidal concerns; did not personally evaluate Lanthorn, discuss Lanthorn with Robertson, review Lanthorn's booking card, or ask the facility nurse to examine Lanthorn; yet instructed Mitchell to place Lanthorn in B–4 if at all possible. (Plaintiffs' Response, pp. 42–45). As the Court has already noted with respect to Mitchell, however, these facts alone do not amount to deliberate indifference. Plaintiffs do not allege Lanthorn told Jamerson he was suicidal or asked for medical care in Jamerson's presence.

However, Plaintiffs add a twist to the analysis of these facts by arguing Jamerson is independently liable as a supervisor because he sent Mitchell to assess Lanthorn without giving him proper direction

or supervision. (Plaintiffs' Response, Court File No. 124, p. 43). Plaintiffs rely on *Greason v. Kemp*, 891 F.2d 829 (11th Cir.1990). In *Greason*, the Eleventh Circuit held: "[A] supervisor can be held liable under section 1983 when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff and his conduct was causally related to the constitutional violation committed by his subordinate." *Id.* at 836. Because the Court has already determined Mitchell, Jamerson's subordinate, did not commit a constitutional violation, Plaintiffs' supervisor liability theory necessarily fails.

The analysis of Plaintiffs' claim against Jamerson does not end here, however. Plaintiffs' final argument concerning Jamerson presents the strongest evidence of deliberate indifference. Plaintiffs contend Jamerson watched Lanthorn tie the noose at 1:45 p.m., but did not alert other jail personnel until 1:55 p.m.

As evidence Jamerson saw Lanthorn tie the noose at 1:45, Plaintiffs rely on the following statement Sheriff Ron England made to the press:

> Our sergeant Jamerson was watching the monitors and seen him when he tried to place the loop on the bars and summonsed an upstairs jailer—they went in and one inmate helped hold him up and the jailers and the inmates took the noose from around his neck.

(Exh. D, Court File No. 124). In another statement, England indicated:

> [Lanthorn] was a Johnson City police department prisoner and ... they transported him down here at 11:00 a.m.... [H]e was booked in, placed in a cell with four other inmates, and like I said at 1:45 while watching the monitor, sergeant Jamerson seen him put the sheet around his neck which was fashioned as a rope.

(*Id.*).

Jamerson contends this evidence is inadmissible because it is hearsay and there-

fore should not be considered in the summary judgment context. Jamerson also asserts lengthy discovery has produced no proof England's statements were accurate, "but has been consistent with the conclusion that he simply misspoke or misunderstood information relayed to him by someone else." (Reply, Court File No. 144, p. 6).

Plaintiffs argue England's statements are not hearsay and are admissible under *Fed.R.Evid.* 801(d)(2)(B) and (D) as an adopted admission or a statement by an agent. (Plaintiffs' Supplemental Response, Court File No. 157, p. 3). According to Plaintiffs, "admissions may be adopted by silence in circumstances where a person would ordinarily object to the declaration." (*Id.* at 4). Jamerson argues he was not present when England made the statements and therefore could not have adopted the statements through silence. (Supplemental Reply, Court File No. 162, p. 3). Jamerson also argues Plaintiff offers no evidence or substantive argument concerning the assertion England was Jamerson's agent.

Alternatively, Plaintiffs argue if England's statements are hearsay, they are nevertheless admissible under *Fed.R.Evid.* 803(24), the residual exception to the hearsay rule. Jamerson points the Court to the Advisory Committee note to Rule 803(24), which states: "It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." Jamerson contends Plaintiffs have failed to show this is an exceptional circumstance.

Finally, Plaintiffs argue England's statements are admissible under *Fed.R.Evid.* 804(a)(3) and 804(b)(5) because "Jamerson claims that he cannot recall whether he met with Sheriff England immediately following the hanging." (Plaintiffs' Supplemental Response, Court File No. 157, p. 5). Plaintiffs essentially contend Jamerson is an unavailable witness under Rule 804(a)(3) ("testifies to a lack of memory of the subject matter of the declarant's statement") and, therefore, England's statements are admissible under Rule 804(b)(5), the residual exception to the hearsay rule. Rule 804(b)(5), however, excepts statements from the hearsay rule "if *the declarant* is unavailable as a witness." (emphasis added). The Court notes Plaintiffs do not contend England, the declarant, is unavailable as a witness.

Although Plaintiffs' asserted rationales for admitting this evidence are of questionable merit, the Court is not convinced England's statements are inadmissible. Consequently, the Court will accord England's statement proper weight in considering Jamerson's summary judgment motion.

Plaintiffs also assert jailers Castle, Robertson, and Adams testified they were not notified of the problem in B–4 until 1:55 p.m. (Court File No. 124, p. 41) (citing Castle Depo., pp. 62–63; Robertson Depo., p. 119; Adams Depo., pp. 40–42). The Court notes the cited pages of Castle's and Robertson's depositions are not attached to Plaintiffs' pleading. The record does contain the cited pages of Adams's deposition, however. Viewing the evidence in the light most favorable to Plaintiffs, Adams's testimony indicates Jamerson did not call a medical emergency until 1:55 p.m.

Accordingly, the Court finds Plaintiffs have introduced some evidence that Jamerson saw Lanthorn initiate the hanging at 1:45, but did not make other officers aware of the situation until 1:55. Because this evidence is sufficient to demonstrate deliberate indifference to Lanthorn's serious need for immediate medical care, the Court will **DENY** Jamerson's motion for summary judgment regarding individual liability under § 1983.

### 3. Sam Garland

■ Plaintiffs argue Garland was deliberately indifferent to Lanthorn's serious medical and psychological needs because Garland described Lanthorn as "not all there" and upset; witnessed Lanthorn kicking uncontrollably, "flopping his body

about in a wild manner," and foaming at the mouth; heard Lanthorn screaming he was having a seizure and asking to go to the hospital; was instructed to contact Lanthorn's physician by the Rescue Squad, but failed to do so; signed the Rescue Squad form refusing transport to the hospital; failed to review Lanthorn's booking card; and failed to contact the Washington County Jail or pass along any information regarding Lanthorn's medical needs. (Plaintiffs' Response, Court File No. 124, pp. 61–63, 64–65; Plaintiffs' Supplemental Response, Court File No. 155, pp. 1–2).

Plaintiffs do not dispute that Garland called the Rescue Squad after he observed Lanthorn kicking uncontrollably, flopping about, foaming at the mouth, screaming he was having a seizure, and asking to go to the hospital. This action certainly does not demonstrate deliberate indifference.

Although Plaintiffs assert Garland failed to contact the Washington County jail or pass along information about Lanthorn's condition, they have produced no evidence that Garland had a duty to transmit information to Washington County. Rather, Plaintiffs argue Johnson City had a policy of transmitting information along with a detainee. (Plaintiffs' Supplemental Response, Court File No. 155, p. 4).

Plaintiffs focus on Garland's signature refusing transport to the hospital. However, Plaintiffs have failed to introduce evidence that the Rescue Squad determined Lanthorn needed to go to the hospital. Moreover, Doug Green, an emergency medical technician, testified he offered to take Lanthorn to the hospital but Lanthorn refused transport. (Green Depo., Court File No. 124, pp. 52–54).

Next, Plaintiffs contend Green told Garland to contact Lanthorn's physician but Garland failed to do so. Green testified he told Garland to contact Lanthorn's physician to determine whether Lanthorn "needed his medications to keep his therapeutic levels up." (*Id.* at 51–52). Garland points out, however, Dr. Kenneth Emil Ferslew testified "Lanthorn had therapeu-

tic levels of both desipramine and Valium in his system at the time of his death." (Ferslew Depo., Court File No. 107, p. 57). Garland also contends this medication had similar therapeutic benefits to the medication Lanthorn claimed he was taking. (Court File No. 145, p. 2). Plaintiffs do not dispute the level of medication in Lanthorn's system or the therapeutic benefits of that medication.

Garland also points out Dr. Fenley, the physician listed on Lanthorn's Johnson City intake form (Court File No. 94, Exh. B), testified he had talked with Lanthorn several days before the arrest, determined Lanthorn was seeking drugs, and advised Lanthorn he would no longer treat him. (Fenley Depo., Court File No. 161, pp. 100–102 & Exh. B). Plaintiff has offered no evidence controverting these assertions.

From this evidence, the Court finds even though Garland failed to call Dr. Fenley in accord with Green's instruction, this omission did not rise to the level of deliberate indifference. Lanthorn did not exhibit to Garland such a strong likelihood that he would attempt to take his own life that failure to take adequate precautions amounted to deliberate indifference to Lanthorn's serious medical needs.

Moreover, Garland's failure to call Dr. Fenley or transmit information to Washington County regarding Lanthorn's condition was not the proximate cause of Lanthorn's death. *See Horn v. Madison County Fiscal Court,* 22 F.3d 653, 659 (6th Cir.1994) ("[P]roximate causation is an essential element of a § 1983 claim for damages."). Plaintiffs speculate if Garland had allowed Lanthorn to be transported to the hospital and examined, a physician would have discovered Lanthorn "was toxic on the psychotropic drug Imipramine," Lanthorn "would have received treatment necessary for his well-being," and he would not have been transported to Washington County. (Plaintiffs' Response, Court File No. 124, p. 53). The Court finds Plaintiffs have produced no evidence directly relating Garland's failure to call Dr.

Fenley to Lanthorn's death. The obvious fact is Lanthorn did not die or suffer life threatening injuries in the Johnson City Jail.

Plaintiffs argue "the absence of information from Johnson City, when the custom was to provide such information, diminished the likelihood that adequate medical care would be provided in Washington County." Diminishing the likelihood of adequate medical care simply is not equivalent to proximately causing death. Because Plaintiffs have not shown Garland was deliberately indifferent to Lanthorn's need for medical care or that Garland proximately caused Lanthorn's death, the Court will **DISMISS** Plaintiffs' § 1983 claim against Garland as it relates to denial of adequate medical care.

Although the Court has already concluded Garland cannot be held personally liable for Lanthorn's death, Plaintiffs' excessive force claim requires further discussion. Plaintiffs rely on the following evidence in support of their excessive force claim:

1. The videotape taken at the Johnson City jail indicates that Sam Garland was the only jailer who entered Craig Lanthorn's cell out of sight of the cameras.

2. Three hundred and eighty pound Garland admitted that he used some force (his foot) against Craig Lanthorn.

3. Dr. Blake testified that the bruise on Craig Lanthorn's buttocks was consistent with a footprint or stomp injury and the bruise above the knee cap was consistent with a foot being placed on the knee area.

4. Other bruises identified in the autopsy appear to have been inflicted in forty-two (42) hours plus or minus six (6) to eight (8) hours from autopsy.

5. Although minor bruises appear to have predated Craig Lanthorn's entry into the Johnson City facility, the bruises in question appear to have occurred twenty-four (24) to forty-two (42) hours prior to hanging—the time period during which Mr. Lanthorn was in Johnson City custody.

6. Lanthorn identified Garland as his abuser to Tom and Roma Cowan, his aunt and uncle, and jailer William Crumley.

(Plaintiffs' Supplemental Response, Court File No. 155, pp. 5–6) (citations omitted).

Initially, the Court notes the videotape referenced in item one has not been submitted to the Court, nor has testimony regarding the contents of the video. Second, the Court notes the videotape alone could not show Garland was the only jailer who entered the cell out of view of the camera. Such a conclusion would require evidence of the time period during which the videotape was recorded, the time period Garland was in Lanthorn's cell, and some further proof that no other jailer entered Lanthorn's cell during the time the videotape was recorded. In short, Plaintiffs' summary reference to the videotape is insufficient to identify Garland as the assailant.

Garland argues Dr. Blake's opinion as to the age of the bruises does not prove Garland inflicted the bruises. According to Garland, Dr. Blake began the autopsy at approximately 2:30 p.m. on August 4, and Garland was in Lanthorn's cell at approximately 2:00 p.m. on August 2. (Garland's Supplemental Reply, Court File No. 171, p. 2). Garland correctly notes Dr. Blake testified the bruises occurred 24 to 42 hours prior to the autopsy, not prior to the hanging as Plaintiffs suggest. (Blake Depo., Court File No. 171, pp. 108–109). Garland argues Lanthorn was in the Washington County jail 24 hours before the autopsy and at 42 hours prior to the autopsy Lanthorn was in the Johnson City jail, but Garland had already left for the day. (Garland's Supplemental Reply, Court File No. 171, p. 2).

Plaintiffs do not establish when the autopsy took place. However, the Court notes Dr. Blake's report states the autopsy

was performed "in the early am hours" of August 4, 1994 after Lanthorn died at approximately 5 a.m. (Blake Depo., Court File No. 145, Exh. 208). Assuming the autopsy was performed at 5 a.m. on August 4, 1994, Dr. Blake's testimony at best establishes Lanthorn incurred bruises between 11 a.m. on August 2 and 5 a.m. on August 3. Thus, viewed in the light most favorable to Plaintiffs, Dr. Blake's testimony merely establishes Lanthorn's bruises might have been incurred while he was in the Johnson City jail. It does not establish the more critical fact: that Garland is the jailer who bruised Lanthorn.

Plaintiffs' only evidence identifying Garland as the assailant consists of statements Lanthorn made to Tom Cowan, Roma Cowan, and William Crumley. Garland argues these statements are inadmissible hearsay. Plaintiffs argue the statements are admissible under *Fed.R.Evid.* 804(b)(5), which provides in pertinent part:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

(5) **Other exceptions.** A statement not specifically covered by any of the foregoing exceptions but having equivalent guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Garland argues Rule 804(b)(5) does not apply because the statements do not have equivalent guarantees of trustworthiness. Plaintiffs contend the statements have equivalent guarantees of trustworthiness because they "will come in through Tom and Roma Cowan, both attorneys admitted to practice in this Court, and of unques-

tionable credibility." (Plaintiffs' Supplemental Response, Court File No. 155, p. 6). Plaintiffs also contend the statements are corroborated by the testimony of William Crumley and Dr. Blake. (*Id.*).

Although the Court certainly does not doubt the credibility of Tom and Roma Cowan, their credibility is not the issue. Rather, the issue is whether the statement of Lanthorn to Tom and Roma Cowan has equivalent guarantees of trustworthiness. The Court finds the statement does not have such guarantees and is therefore inadmissible hearsay.

Roma Cowan testified Lanthorn appeared to be "under the influence" while he was in jail. (Court File No. 107, R. Cowan Depo., p. 25, 36–37). Tom Cowan testified Lanthorn said he had been beaten by "a big, bad man" in a "dark blue shirt." (Court File No. 107, T. Cowan Depo., p. 14). According to Tom Cowan, he took Lanthorn out to jailer Bill Crumley and asked if Crumley was the assailant. Lanthorn said, "No, ... he was a much bigger person." (*Id.*). Crumley then described Garland, and Lanthorn said, "Yeah, that's him." (*Id.* at 15).[5] Crumley also testified Lanthorn stated the person who beat him was wearing a dark blue shirt and that jailers, including Garland, wore white shirts. (Crumley Depo., Court File No. 124, pp. 51–53). The Court finds Lanthorn's statements do not have equivalent guarantees of trustworthiness and therefore are not admissible pursuant to Rule 804(b)(5).

Because Plaintiffs' have insufficient evidence linking Garland to the bruises found on Lanthorn, the Court finds Garland is entitled to summary judgment on Plaintiffs' excessive force claim. *Cf. Doe v. Sullivan County,* 956 F.2d 545, 550 (6th Cir.1992), *cert. denied,* 506 U.S. 864, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992) (recognizing proving causality is difficult but nevertheless requiring plaintiff to produce more than "naked assertion" that assault

---

**5.** The Court notes Roma Cowan's description of these events is substantially similar to Tom

Cowan's description. (*See* R. Cowan Depo., Court File No. 124, pp. 19–22).

would not have occurred but for alleged overcrowding).

## B. Municipal Liability

 The doctrine of respondeat superior does not apply to municipalities. *Board of County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). "[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* "The plaintiff must ... demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* In other words, the plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

 Plaintiffs argue Washington County had policies of deliberate indifference to serious medical needs and to safe confinement. In connection with these policies, Plaintiffs assert three basic arguments.

First, Plaintiffs contend Sheriff England ratified Jamerson's actions by failing to investigate or discipline him and thus adopted a policy of deliberate indifference to serious medical needs which subjects Washington County to liability. In support of this argument, Plaintiffs cite *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1247–48 (6th Cir.1989) and *Marchese v. Lucas,* 758 F.2d 181, 188 (6th Cir.1985). Having carefully reviewed *Leach* and *Marchese,* the Court finds those cases do not support a finding of municipal liability in this case. Plaintiffs have failed to show how England's alleged ratification of Jamerson's acts caused or contributed to the alleged deprivation of Lanthorn's constitutional rights. *See Brown,* 117 S.Ct. at 1388 (requiring plaintiff to show direct causal link); *Marchese,* 758 F.2d at 189 (finding injuries *resulted* from official policy of sheriff).

Second, Plaintiffs argue Washington County has exhibited deliberate indifference to serious medical needs by failing to train its officers to assess Lanthorn's sui-

cide risk and take reasonable steps to protect him. (Court File No. 124, p. 36). The United States Supreme Court has held inadequate training can be the basis for § 1983 liability under certain conditions:

in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*Brown,* 117 S.Ct. at 1391.

Plaintiffs contend the officers in this case, like the officers in *Russo v. City of Cincinnati,* 953 F.2d 1036, 1046 (6th Cir. 1992), have admitted they frequently deal with "mentally and emotionally disturbed and disabled individuals" but were unable to specifically describe the content of their training. Plaintiffs assert "Washington County had sufficient information that, if properly trained, would have alerted its personnel to Craig Lanthorn's suicide risk and their duty to take reasonable steps to protect him." As previously discussed in connection with individual liability, however, the Court has already determined Lanthorn did not exhibit such a strong likelihood of suicide that he was constitutionally entitled to suicide screening and prevention.

Washington County cites *Barber v. City of Salem,* 953 F.2d 232 (6th Cir.1992). In *Barber,* the Sixth Circuit found the decedent had not exhibited a strong likelihood he would commit suicide; therefore, the

failure to take special precautions did not amount to a constitutional violation of deliberate indifference to serious medical needs. With respect to municipal liability, the Court concluded: "[W]here no constitutional violation exists for failure to take special precautions, none exists for failure to promulgate policies and to better train personnel to detect and deter jail suicides." *Id.* at 240.

Plaintiffs argue Washington County's reliance on *Barber* is misplaced because the law has changed since the suicide in *Barber*. According to Plaintiffs, the suicide in this case took place nine years "after the Sixth Circuit recognized the potential liability resulting from a failure to properly take precautions in a suicide situation"—apparently in the *Danese* decision which was rendered in 1985—and after *Horn v. Madison County*, 22 F.3d 653 (6th Cir.1994), *Roberts v. City of Troy*, 773 F.2d 720 (6th Cir.1985), and *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

The Court notes, however, the latest Sixth Circuit case cited by Plaintiffs, *Horn v. Madison County*, did not change the law established by *Danese*, but instead cited and reiterated the essential holding of *Danese* by stating: "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn*, 22 F.3d at 660.

Plaintiffs further argue:

> [I]n *Barber*, there was no evidence that the decedent had requested to see a doctor, there was no doctor at the scene informing the arresting officer that the decedent was delusional, and needed medical care, there was no disclosed history of panic attacks, psychotropic medications, or seizures, and there was no evidence such as the extensive evidence of abnormal behavior or a known recent commitment to a mental institution for suicidal concerns.

(Court File No. 158, p. 2).

Initially, the Court notes Plaintiffs have not pointed the Court to evidence indicating Lanthorn asked a Washington County employee to see a physician. (*See* Court File No. 158; Court File No. 124, pp. 20–37). With respect to the remaining facts asserted by Plaintiffs, the Court has already determined those facts do not exhibit a strong likelihood of suicide and therefore do not give rise to a constitutional violation.

Third, Plaintiffs assert Washington County was deliberately indifferent to safe conditions of confinement because three suicides had occurred in cell B–4, yet Washington County never removed the horizontal bars from that cell. This argument requires careful attention to the particular right Plaintiffs assert. Plaintiffs' real argument is that Lanthorn should not have been placed in B–4 because he was suicidal. Thus, in essence, Plaintiffs are reasserting Lanthorn's right to be screened for suicidal tendencies. Again, the Court has already determined Lanthorn did not exhibit a strong likelihood of suicide; therefore, the decision to place Lanthorn in B–4 was not a product of a municipal policy of deliberate indifference to safe conditions of confinement. In short, the Court finds Washington County is entitled to summary judgment on Plaintiffs' § 1983 claim because Plaintiffs have failed to show that a policy or custom of Washington County was the "moving force" behind deprivation of Lanthorn's constitutional rights.

The Court also finds Johnson City is entitled to summary judgment with respect to Plaintiffs' § 1983 claim. Plaintiffs assert Johnson City had a policy or custom of deliberate indifference to serious medical needs because it failed to properly train its officers. As the Court concluded with respect to Washington County, however, Plaintiffs have not shown an underlying constitutional violation giving rise to a duty to train.

In addition, the Court finds Plaintiffs have failed to demonstrate an action by Johnson City directly resulted in deprivation of Lanthorn's rights. *See Brown*, 117

S.Ct. at 1388. Plaintiffs argue "[t]he Johnson City officers' failure to provide adequate medical care for Craig Lanthorn, as well as their failure to pass along information to the Washington County jail officials regarding Craig's medical needs, constitute deliberate indifference to those needs and also establish proximate cause of Craig Lanthorn's later demise." (Court File No. 124, pp. 53–54). Plaintiffs do not offer any authority indicating Johnson City had a duty to pass information on to Washington County. Thus, Plaintiffs' argument devolves to: "[I]f adequate medical care had been rendered, Mr. Lanthorn would not have been in the position to commit suicide." (Court File No. 152, p. 6). This argument is insufficient to prove Johnson City proximately caused a deprivation of Lanthorn's constitutional rights. *See Horn v. Madison County,* 22 F.3d 653, 659 (6th Cir.1994) ("[P]roximate causation is an essential element of a § 1983 claim for damages.").

## V. CONCLUSION

The Court finds Defendants Mitchell and Garland are entitled to qualified immunity with respect to Plaintiffs' § 1983 claims based on the right to adequate medical care, and Garland is entitled to summary judgment with respect to Plaintiffs' excessive force claim. In addition, the Court finds Defendants Washington County and Johnson City are entitled to summary judgment on Plaintiffs' § 1983 claims. Remaining for adjudication are Plaintiffs' state law claims, on which the Court has reserved ruling, and Plaintiffs' § 1983 claim against Defendant Jamerson in his individual capacity.